

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SLT

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 31, 2010

By ECF and Hand Delivery

The Honorable Viktor Pohorelsky
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York

Re: United States v. Jonathan Braun,
Criminal Docket No. 10 CR 433(SLT)

Dear Judge Pohorelsky:

The government respectfully submits this letter with regard to the bail hearing of the above-captioned defendant, scheduled for June 1, 2010 at 3:00 p.m. JONATHAN BRAUN is charged in a four-count indictment with, among other things: conspiracy to import in excess of 1,000 kilograms of marijuana; conspiracy to distribute in excess of 1,000 kilograms of marijuana; and conspiracy to launder the proceeds of narcotics trafficking. The government moves for a permanent order of detention on the grounds that: (i) the crimes charged in the indictment involve narcotics trafficking and thus, fall within the presumption set forth in Section 3142(f)(1); and (ii) BRAUN presents both a serious risk of flight and a danger to the community.

As detailed below, because of the significant jail time BRAUN is facing, his access to substantial amounts of untraceable cash, his frequent international travel, his expressed intent to flee the country if released on bond and the fact that BRAUN previously fled from the United States before he could be arrested, BRAUN poses a risk of flight that cannot be mitigated by any condition or combination of conditions.

In addition, as leader of an international drug trafficking organization, BRAUN employed threats and the actual use of violence to collect his drug debts and to deter fellow co-conspirators from cooperating with the government. Accordingly, he should also be detained as a danger to the community.

## I. FACTUAL STATEMENT

The government proffers the following facts in support of its motion for a permanent order of detention.[1]

Since approximately November 2007, the DEA Task Force has been investigating an international organization involved with the large-scale trafficking of hydroponic marijuana from Canada into the United States. The investigation, which has included the use of court-authorized wire interceptions, information obtained from reliable sources of information, physical surveillance and multiple seizures of narcotics and narcotics proceeds, has revealed that the defendant JONATHAN BRAUN is a high-ranking member of the drug trafficking organization and that the organization has smuggled more than 100,000 kilograms of marijuana into the United States, mostly through Native American reservations along the U.S.-Canadian border. Specifically, the investigation has revealed that BRAUN and his organization obtain massive quantities of marijuana from sources of supply in Canada and employ a multitude of drivers and boatmen to smuggle the narcotics onto the Akwesasne Native American Reservation, which straddles the United States and Canada. The organization then utilizes vehicles with hidden compartments to transport the marijuana from the Reservation to stash houses in Queens and Staten Island, New York, from which the marijuana is then distributed throughout the metropolitan New York area by street-level distributors. During the course of the investigation, law enforcement officers identified multiple vehicles used by the organization to pick up, transport and distribute narcotics and narcotics proceeds. Officers conducted traffic stops of several vehicles used by the organization and executed search warrants on numerous stash houses used to store narcotics and narcotics proceeds, resulting in the seizure of more than one thousand pounds of marijuana and hundreds of thousands of dollars in United States currency believed to be narcotics proceeds.

The investigation has further revealed that JONATHAN BRAUN has personally orchestrated the importation of thousands of kilograms of marijuana into the United States and has ties to several organized crime groups in Canada. For more than three years, BRAUN has coordinated weekly shipments of marijuana from

---

[1] See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same).

Canada into the Eastern District of New York, distributed the marijuana to other co-conspirators in the New York metropolitan area, and smuggled millions of dollars in drug proceeds back to the sources of supply in Canada. To facilitate the transportation and distribution of narcotics and narcotics proceeds, BRAUN employed the services of numerous co-conspirators who used vehicles with hidden compartments to smuggle the drugs and drug proceeds across the border, transport the marijuana to customers in the Eastern District of New York and smuggle the drug proceeds back across the border to Canada.

In May 2009, DEA agents raided a stash house in Staten Island controlled by BRAUN. A search of the house resulted in the seizure of more than 600 pounds of hydroponic marijuana and $500,000 in United States currency. According to several reliable cooperating witnesses, corroborated by travel records and numerous intercepted communications, BRAUN fled to Israel immediately after his stash house was raided in order to escape arrest. BRAUN remained in hiding, first in Israel, then eventually in Canada, for months before returning to the United States. While abroad, BRAUN continued to direct the operations of his drug organization by using encrypted blackberry devices to communicate with his underlings and drug customers.

The evidence against BRAUN is overwhelming. BRAUN and his co-conspirators have been intercepted on both wiretaps and consensually monitored recordings discussing the importation and distribution of marijuana and the payment of millions of dollars in drug proceeds. BRAUN has been captured on surveillance on numerous occasions engaging in narcotics-related activities. Moreover, on the night of his arrest, DEA agents executed a search warrant on BRAUN's residence in Staten Island and found, among other things, approximately $30,000 in U.S. currency wrapped in rubber bands, narcotics packaging materials, over 16 cellular telephones and blackberry devices (at least two of which had been used by BRAUN to send text messages regarding drug shipments and payments that were intercepted by law enforcement) and drug records documenting BRAUN's participation in large-quantity shipments of hydroponic marijuana for several years. In particular, the drug ledgers found in BRAUN's residence reference hundreds of separate marijuana shipments totaling tens of thousands of kilograms. The records also documented BRAUN's access to and movement of substantial amounts of cash. For example, a single entry in the ledger (which contains dozens of similar entries) reflected BRAUN's payment of over $450,000 in transportation costs for marijuana shipments over a specified period of time.

## II. ARGUMENT

### A. The Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts must order a defendant's pre-trial detention upon determining that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See Chimurenga, 760 F.2d at 405.

In a case in which the defendant is charged with one of the crimes enumerated in Section 3142(f)(1), "[s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community." Title 18, United States Code, Section 3142(e)(3). To properly rebut this presumption, the defendant needs to show that "the specific nature of the crimes charged or ... something about their individual circumstances" establishes the defendant is not a danger or likely to flee. United States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1986). Moreover, any attempt by the defendant to defeat the presumption does not eliminate the presumption entirely. See United States v. Hare, 873 F.2d 796, 798 (5th Cir. 1989) ("presumption is not a mere 'bursting bubble' that totally disappears from the judge's consideration after the defendant comes forward with evidence"). The presumption remains as one factor of many to be considered by the judicial officer in relation to the congressional paradigm. See United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987); United States v. Williams, 753 F.2d 329 (4th Cir. 1985) (court erred in failing to take into account drug dealing as a danger to the community).

The Bail Reform Act lists the following four factors as relevant to the determination of whether detention is appropriate: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release, and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g).

Further, the legislative history indicates that danger to the community is not limited to violent crimes, but to any

crimes that would harm the community. See Senate Report at 3195-96 ("language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.") (emphasis added).

The Second Circuit has repeatedly stated that even elaborate conditions of home detention cannot substitute for incarceration where the defendant is violent or cannot be trusted to comply with the conditions of release. See United States v. Millan, 4 F.3d 1038, 1048-49 (2d Cir. 1993) (home detention and electronic surveillance can be circumvented); United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("home detention and electronic monitoring at best 'elaborately replicate a detention facility without the confidence of security such a facility instills'") (quoting United States v. Gotti, 776 F. Supp. 666, 672 (E.D.N.Y. 1991)); see also United States v. Tortora, 922 F.2d 880, 886-87 (1st Cir. 1990) (elaborate conditions dependent upon good faith compliance were insufficient where the defendant's violent history provided no basis for believing that good faith would be forthcoming).

BRAUN is charged with narcotics trafficking, one of the crimes enumerated in Section 3142(f)(1); thus, there is a presumption that he should be detained as both a risk of flight and a danger to the community. For the reasons discussed below, BRAUN will be unable to rebut that presumption and should be detained regardless of any proposed conditions of release.

B. BRAUN Presents a Danger to the Community

BRAUN is charged in multiple conspiracies in connection with his importation and distribution of marijuana. The evidence reveals that he has been a high-level leader in an international drug organization for several years and is directly responsible for the importation and distribution of thousands of kilograms of marijuana. This fact alone makes BRAUN a presumptive danger to the community.

Moreover, as a leader in the organization, the defendant persevered in his drug importation activities despite seizures of some of his drug shipments by law enforcement and prosecutions of co-conspirators. Indeed, BRAUN continued to control and direct the organization despite being on the run in a foreign country and hiding from law enforcement for nearly a year. Therefore, there is little reason to conclude that the

defendant’s drug importation schemes will cease as a result of the defendant’s arrest and there is a substantial likelihood that, if released, BRAUN will resume his illegal activities.

Finally, BRAUN has used threats and actual violence to collect drug debts and prevent his criminal underlings from cooperating with law enforcement. For example, a member of BRAUN’s drug organization who worked directly under BRAUN (“CW1") has stated, in sum and substance, that BRAUN threatened and violently assaulted one of his workers after finding out that the drug stash house BRAUN’s worker was in charge of maintaining had been robbed. CW1 further stated that when BRAUN found out that $100,000 in marijuana had been stolen from his stash house, BRAUN immediately took a flight out to California (where the stash house was located) to confront the worker BRAUN had assigned to watch the stash house. According to CW1, BRAUN proceeded to “whip” the worker with a belt and threaten that he/she needed to get BRAUN’s money back “in any way possible” or BRAUN would go to the worker’s “family members” for the money.

BRAUN’s use of violence is further demonstrated by intercepted text messages in which he threatened a criminal associate after the associate indicated that he/she was going to inform law enforcement about BRAUN’s criminal activities. Among other things, the associate sent the following messages to BRAUN: “you will get what the f*ck is coming to you”; “you deserve to be locked in a cage [prison] like the animal you are”; “[you’ll] get what u deserve”; “[your] family will b so proud of [their] son [for being arrested]”; “your money is not going to be worth d*ck [after BRAUN’s arrest]”; and “[you’ll] see what happens to bad people.” In addition, the associate and BRAUN exchanged numerous text messages in which they discussed BRAUN coming to the associate’s place of business, “breaching security” and attempting to assault the associate in front of his/her “boss.” The associate also indicated that he/she was going to get a “restraining order” against BRAUN based on the assault and stated: “If I lose my job because of this – you will regret it and that is a promise.” Subsequent text messages and telephone conversations made it clear that the associate’s threat to BRAUN about getting what he deserves and regretting his assault at the associate’s job was a reference to the associate going to the police to inform them of BRAUN’s criminal activities.

In response to the associate’s threats to go to the police, BRAUN replied: “I came [to your job] so you realize that I’m not playing . . . games.” BRAUN further stated “[I]f you interfere with my life and make me uncomfortable you will leave me no choice but to do the same back to you in a much worse way.”

Based on their training and experience and the investigation that has been conducted thus far, investigating agents believe that BRAUN was threatening violence against the criminal associate to prevent him/her from cooperating with law enforcement.

The Second Circuit has addressed the issue of pre-trial detention in assuring the safety of the community against a defendant who has engaged in obstruction of justice. In United States v. LaFontaine, 210 F.3d 125, 2000 WL 373949, *8-9 (2d Cir. Apr. 12, 2000), the district court revoked the defendant's bail based on evidence that LaFontaine had sought to influence witnesses while released on bond. The defendant appealed, arguing that in the context of a non-violent, white-collar case, elaborate release conditions, including home detention, electronic monitoring, phone tap and relocation to a different state would assure the safety of the community. Id. at *8. The Second Circuit upheld the lower court's revocation of bail. The Court ruled that "we have held that a record of violence or dangerousness [in the sense of violence or threats aimed against witnesses] is not necessary to support pre-trial detention." Id. (citing Ferranti, 66 F.3d at 543 and United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991)). The Court noted that in United States v. Gotti, 794 F.2d 773, 779 & n.9 (2d Cir. 1991), the Second Circuit held that a "single incident of witness tampering constituted a 'threat to the integrity of the trial process, rather than more generally a danger to the community,' and was sufficient to revoke bail." LaFontaine, 2000 WL 373949, at *9 (quoting Gotti, 794 F.2d at 779 n.5). The court further observed that, as in Gotti, "pre-trial detention was even more justified in cases of violations related to the trial process (such as witness tampering) than in cases where the defendant's past criminality was said to support a finding of general dangerousness." LaFontaine, 2000 WL 373949, at *9; see also United States v. Agnello, 101 F. Supp. 2d 108 (E.D.N.Y. 2000) (reversing magistrate judge and ordering detention based, in part, on evidence that the defendant attempted to obstruct justice in a prior case).

As in Gotti and LaFontaine, BRAUN's attempt to influence witnesses is a direct "threat to the integrity of the trial process" and alone justifies his detention. LaFontaine, 2000 WL 373949, at *9 (quoting Gotti, 794 F.2d at 779 n.5). The risk that BRAUN will attempt to influence or harm witnesses is particularly high in this case. The government has numerous cooperating witnesses against BRAUN, all of whom have expressed serious concerns as to their safety in light of BRAUN's violent tendencies and threats to harm anyone who "crosses" him. Indeed, at least one cooperating witness has already been threatened with

physical violence by a member of BRAUN's drug organization. Moreover, the government has identified numerous co-conspirators and associates of BRAUN who could potentially become witnesses. Since not all of these potential witnesses have yet been located and interviewed, protecting them from undue influence or threats of violence is especially important.

In sum, BRAUN's demonstrated use and threatened use of violence against co-conspirators and potential witnesses, coupled with the general presumption of dangerousness concomitant with his status as the leader of a large drug trafficking organization establishes by clear and convincing evidence that BRAUN is a danger to the community and should be detained.

B. BRAUN Presents a Substantial Risk of Flight

Even if BRAUN did not present such a substantial danger to the community, his detention would nevertheless be warranted by the overwhelming risk of flight.

1. BRAUN Faces a Substantial Sentence if Convicted

In evaluating risk of flight, it is appropriate to consider the potential sentence that the defendant is facing, see, e.g., United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight), as well as any overseas connections the defendant may have which would facilitate flight. See, e.g. United States v. Botero, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) (finding pretrial detention warranted where the defendant had "considerable means and foreign connections which would make it possible for him to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences").

Based on the quantity of marijuana involved in the offense and the defendant's leadership role, BRAUN's offense level under the advisory Sentencing Guidelines would likely be level 42. Thus, even assuming BRAUN falls within criminal history category I, he faces a potential incarceratory sentence of 360 months to life. At the bare minimum, BRAUN faces a mandatory 10-year sentence if convicted of any of the charged narcotics offenses. Given the massive penalties he faces, BRAUN has a powerful motive to flee.

2. Braun's Access to Substantial Assets

BRAUN has the means and ability to flee and live a comfortable life outside the reach of United States law enforcement. BRAUN has access to nearly unlimited funds based on his years of being the leader of a vast international narcotics organization. Just the marijuana seized during this investigation alone (which represents only a fraction of the narcotics BRAUN imported and distributed) has an estimated value of more than $60 million. Yet BRAUN's importation activities continued virtually unfazed despite the seizure of $60 million worth of narcotics and half a million dollars of BRAUN's money. BRAUN has moved millions of dollars in drug proceeds across the U.S. border, stored in excess of $500,000 in a single stash house that was recovered by the DEA, had more than $30,000 in cash just lying around his house and drug records found in his residence indicate that BRAUN has handled millions of dollars in drug proceeds. Notably, BRAUN refused to provide any information about his finances to Pretrial Services and immediately retained an expensive private defense counsel, further evidencing his access to considerable funds.

Moreover, the majority of BRAUN's assets remain unaccounted for. Indeed, since BRAUN's drug business dealt almost exclusively with untraceable cash, it is highly unlikely that the government will be able to locate and restrain these assets at all, much less in the short time period that would be necessary to block BRAUN's use of such funds to flee the United States.

3. BRAUN Has Substantial Foreign Ties and Has Already Fled The United States to Avoid Arrest Once Before

In May 2009, DEA agents raided a stash house in Staten Island controlled by BRAUN. A search of the house resulted in the seizure of more than 600 pounds of hydroponic marijuana and $500,000 in United States currency, and resulted in the arrests of several members of BRAUN's drug organization. According to several reliable cooperating witnesses, BRAUN fled to Israel after the stash house was raided in order to escape arrest. BRAUN remained in hiding, first in Israel, then eventually in Canada, for months before returning to the United States.

The information regarding BRAUN's flight is substantially corroborated by travel records and intercepted communications. For example, official records from U.S. Immigration and Customs Enforcement ("ICE") confirm that BRAUN left the United States and traveled to Israel shortly after the

Staten Island stash house was raided.

In addition, BRAUN was intercepted on court-authorized wiretaps discussing his flight on multiple occasions. For instance, in conversations with his ex-girlfriend, BRAUN was intercepted discussing leaving the country for several months. In response, BRAUN's girlfriend stated that she "waited months" for BRAUN "when u [BRAUN] were fleeing the country" and "on the run." In subsequent intercepted text messages, BRAUN's girlfriend again stated that BRAUN was "doing illegal sh*t" and "fleeing countries" – a clear indication that BRAUN fled the country to avoid arrest.

In addition to this particular instance of international flight to avoid arrest, BRAUN has made numerous international trips within the last few years, and has strong ties to several foreign countries, including Israel and Canada. ICE records document that BRAUN has made frequent international trips over the last few years to multiple foreign countries. Moreover, according to several reliable cooperating witnesses, BRAUN has often been smuggled across the border into Canada by his Canadian co-conspirators without passing through customs checkpoints.

4. <u>BRAUN Has Expressed An Intent to Flee if Released</u>

Perhaps even more troubling than his previous flight to avoid prosecution, BRAUN has specifically expressed an intent to flee if released on bail. A reliable cooperating witness, who worked for BRAUN for the past several years ("CW2"), has informed the government that BRAUN can obtain false documents and has indicated his intent to flee if he was ever caught. CW2 has engaged in multiple conversations with BRAUN during which BRAUN made statements to the effect that he could easily obtain false passports and other travel documents, that he had access to large sums of money overseas and that if he was ever arrested and released on bail he would flee the United States and "they would never see me again."

BRAUN's statements are far from idle boasting. On the night of his arrest, DEA agents executed a search warrant on BRAUN's residence and found five identical, pristine New York State driver's licenses. Since agents also retrieved BRAUN's <u>actual</u> driver's license from his person at the time of his arrest, the five identical driver's licenses found in BRAUN's house were obviously fraudulent identification documents. If BRAUN can obtain false driver's licenses, there is no reason why he cannot also obtain false passports or other travel documents

that will enable him to flee the United States.

Given BRAUN's expressed intent to flee, his prior act of fleeing the United States to avoid prosecution, his access to vast sums of drug proceeds, his strong ties to multiple foreign jurisdictions and the lengthy incarceration BRAUN faces if convicted, the government respectfully submits that no condition or combination of conditions will be sufficient to guarantee his appearance in court.

## III. Conclusion

For all of these reasons, the government respectfully requests that defendant JONATHAN BRAUN be detained and that a permanent order of detention be entered.

In the event that the Court is inclined to release the defendant over the government's objection, the government respectfully requests that any such release order be stayed pursuant to 18 U.S.C. § 3142(f) pending the government's request for a detention hearing before the assigned District Judge.

Very truly yours,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

By: ______________________
Steven L. Tiscione
Assistant U.S. Attorney
(718) 254-6317

cc: Gerald Shargel, Esq. (By ECF and Fascimile)