UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------X

UNITED STATES OF AMERICA,

    - against -                  **MEMORANDUM & ORDER**

JONATHAN BRAUN,               10-CR-433 (KAM)

          *Defendant*.

----------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

On November 3, 2011, defendant Jonathan Braun ("Defendant" or "Braun"), pleaded guilty to one count of conspiracy to import more than 1,000 kilograms of marijuana and one count of money laundering to promote the carrying on of narcotics trafficking. (ECF No. 36.) On May 28, 2019, Defendant was sentenced to ten years of custody on the conspiracy to import marijuana count, and three years of custody on the money laundering count to be served concurrently, a five-year supervised release term, a $100,000 fine to be paid according to a court-ordered payment plan, and a $200 mandatory special assessment. (ECF No. 163, "Judgment".) On January 19, 2021, Defendant's custodial sentence was commuted by President Donald J. Trump, leaving in place Defendant's fine, supervised release term and conditions. Among other things, Defendant's conditions of supervised release included the mandatory condition that he must not commit another local, state,

or federal crime.  (Judgment at 3.)

On April 1, 2025, the Probation Office and the government charged Defendant with seven violations of supervised release, and on May 1, 2025, with Charges Eight through Ten, arising from his supervised release conditions, including that he not commit another local, state, or federal crime.  Specifically, the government contends that Defendant committed:

(1)   Assault in the second degree, in violation of New York Penal Law § 120.05 ("Charge One");

(2)   Assault in the third degree, in violation of New York Penal Law § 120.00 ("Charge Two");

(3)   Child endangerment, in violation of New York Penal Law § 260.10 ("Charge Three");

(4)   Menacing of Brianna Peace, in violation of New York Penal Law § 120.14 ("Charge Four");

(5)   Menacing of Edward Miller, in violation of New York Penal Law § 120.15 ("Charge Five");

(6)   Forcible touching, in violation of New York Penal Law § 130.52 ("Charge Six");

(7)   Petit larceny, in violation of New York Penal Law § 155.25 ("Charge Seven");

(8)   Sexual abuse, in violation of New York Penal Law § 130.65(1) ("Charge Eight"); and

(9)   failure to pay a fine ("Charge Nine").

(ECF Nos. 214, 229.)  Pending before the Court are Charges Two through Nine.  The government is not proceeding on Charges One and Ten.  (ECF No. 247, "Gov't Mem." at 5; May 15, 2025 Revocation Hr'g Tr. 3:16-4:2.)

2

Defendant pleaded not guilty to all charges pending before the Court. Accordingly, the Court conducted a four-day revocation hearing on April 10, April 11, May 15, and June 13, 2025, on Charges Two Through Nine, and thereafter received written submissions from both parties. (*See* ECF Nos. 247, 248, 252.)

## LEGAL STANDARD

The government bears the burden to prove by a preponderance of the evidence that the defendant violated the conditions of his supervised release. 18 U.S.C. § 3583(e)(3). "The preponderance standard requires proof that the defendant's violation of supervision was more likely than not." *United States v. Edwards*, 834 F.3d 180, 199 (2d Cir. 2016) (internal quotation marks omitted). "Revocation proceedings are not deemed part of a criminal prosecution, and, therefore, defendants in such proceedings are not entitled to 'the full panoply of rights' that criminal defendants generally enjoy." *United States v. Carthen*, 681 F.3d 94, 99 (2d Cir. 2012) (quoting *Morrisey v. Brewer*, 408 U.S. 471, 480 (1972)).

Accordingly, in assessing whether a violation of supervised release occurred, standard evidentiary rules do not apply. The Second Circuit consistently holds that the right of confrontation does not apply to revocation hearings and does not prohibit the consideration of hearsay testimony in violation of supervised release proceedings. *See United States v. Aspinall*, 389 F.3d 332,

3

340 (2d Cir. 2004) (noting "the inapplicability of the Confrontation Clause and the Federal Rules of Evidence to probation revocation proceedings"). However, the Federal Rules of Criminal Procedure provides that in a revocation hearing, the defendant must have "an opportunity . . . to question any adverse witness, unless the judge determines that the interest of justice does not require the witness to appear." *United States v. Williams*, 443 F.3d 35, 45 (2d Cir. 2006) (citing Fed. R. Crim. P. 32.1(b)(2)(c)). In making that determination, the court "must balance, on the one hand, the defendant's interest in confronting the declarant, against . . . the government's reasons for the producing the witness and the reliability of the proffered hearsay." *Williams*, 443 F.3d at 45.

<u>**VIOLATIONS OF SUPERVISED RELEASE**</u>

Based on the parties' submissions, the evidence presented, and the Court's assessment of the witnesses' credibility, the Court finds that the government has not met its burden on Charges One, Two, and Three, but has met its burden on Charges Four, Five, Six, Seven, Eight, and Nine.

**I.   Charges One, Two and Three – March 29, 2025 Incident at Defendant's Home**

The government acknowledges, and the Court agrees, that it has not proven Charge One. (Gov't Mem. at 5.) For the reasons set forth below, the Court separately finds that the government

4

has not proven Charges Two and Three by a preponderance of the evidence.

### a. Factual Findings

On March 29, 2025, an individual named Shammai, his wife Sara, their four young children, and their children's nanny were at Defendant's home.[1] (*See* April 10, 2025 Revocation Hr'g Tr. 6:19-7:15.) At approximately 9:45 a.m. on March 29, 2025, Defendant and Shammai engaged in a heated conversation while seated on a couch, which led to Defendant grabbing Shammai and them both falling to the ground. (*Id.* 8:5-11.) Defendant's butler, Justin Dizon, testified that after Defendant and Shammai fell on the ground, he broke them apart by pulling Defendant off of Shammai. (*Id.* 8:9-15.) Shammai testified to being hit in the head by Defendant during this altercation and injuring his elbow from the fall. (May 15, 2025 Revocation Hr'g Tr. 83:7-11; 109:6-8; *see* GX 22.) As depicted in photos later taken at the police station, Shammai incurred a laceration on his elbow. (*See* GX 22.) Shammai also testified that his head hurt after the altercation, and he experienced pain while chewing for several days after Defendant struck him in the head. (May 15, 2025 Revocation Hr'g Tr. 109:12-110:13.)

After being pulled off of Shammai by Mr. Dizon, Defendant

---

[1] To avoid disclosure of the identities of minor children, the Court identifies Shammai and Sara by their first names only.

told Shammai to leave the house and continued to follow Shammai around the home as Shammai prepared to leave. (April 10, 2025 Revocation Hr'g Tr. 9:3-13; GX 12, 13, 14.) Video evidence, time stamped 9:53 a.m. on March 29, 2025, depicts Defendant screaming and cursing at Shammai while chasing Shammai around the kitchen area of Defendant's home. (GX 12.) Shammai continued to back away from Defendant with his arm raised as Defendant lunged forward and kicked Shammai while yelling "I'll fuck you up" and "Get the fuck out" at Shammai. (*See id.*) Mr. Dizon testified that Defendant had kicked Shammai once. (April 10, 2025 Revocation Hr'g Tr. 9:14-20.)

At approximately 9:54 a.m., Defendant is depicted on video yelling at and following Shammai through the foyer of the house as Shammai walked towards the room where his family was located. (GX 13.) Approximately two minutes later at 9:56 a.m., Defendant is depicted yelling and cursing at Shammai while following Shammai and his family as they walked in a hurried manner towards the exit. (GX 14.) Defendant continued to follow them closely and yell, "dirty fucking kids" and to "get the fuck out of here now." (GX 14; May 15, 2025 Revocation Hr'g Tr. 85:10-86:1.) Shammai's wife, Sara, and their nanny both held small children in their arms as they walked quickly towards the home's exit. (GX 14.) Shammai's three-year old son (the "Minor Victim") also walked quickly with his family as they exited the Defendant's home. (*See id.*) After

exiting the video frame, the Minor Victim fell on the ground outside Defendant's home. (May 15, 2025 Revocation Hr'g Tr. 89:2-90:12.)

During the revocation hearing, both Shammai and his wife, Sara, testified that Shammai's children became upset and were crying as Defendant yelled and cursed at them, and told them to get out of his home while walking in close proximity to them. (May 15, 2025 Revocation Hr'g Tr. 89:2-90:12; June 13, 2025 Revocation Hr'g Tr. 421:4-13.) Sara further testified that she and their children cried the whole way home due to Defendant's yelling and cursing while he urged them to leave. (June 13, 2025 Revocation Hr'g Tr. 421:4-13.) The Minor Victim, following this incident at Defendant's home, described Defendant as a "scary man" and told his mother that he does not want to be near a "scary man house" whenever he saw a large house. (June 13, 2025 Revocation Hr'g Tr. 425:4-13.)

The same day, after Shammai and his family departed from Defendant's home, Shammai made a report to the Nassau County Police Department ("NCPD") that he and the Minor Victim had been assaulted by Defendant. (*See* GX 27.) Shammai also told Defendant's butler, Mr. Dizon, that Defendant hit him and his son, to which Mr. Dizon responded "I know, bro . . I didn't see him hit your son though. . . I didn't see that." (GX 29.) At the revocation hearing, Shammai testified that, although he remembers making the March 29,

2025 police report, he now only remembers seeing the Minor Victim get up off the ground but did not see how he fell. (May 15, 2025 Revocation Hr'g Tr. 89:2-90:12.) Shammai further testified that for two to three days following the altercation with Defendant, he experienced "minor" head pain whenever he was chewing. (*Id.* 109:12-110:13.)

**b. Preponderance Finding on Charge Two**

The Court finds that the government has not proven Charge Two, which cites the New York Penal Law, by a preponderance of the evidence. Defendant was arrested and charged on March 29, 2025 with violating New York Penal Law § 120.00, which requires proof that the defendant intentionally or recklessly caused physical injury to another person. "Physical injury" is defined as "impairment of physical condition or substantial pain." N.Y. Penal Law § 10.00. As stated by the New York Court of Appeals, "impairment of a physical condition" does not require a victim's incapacitation. *People v. Tejeda*, 578 N.E.2d 431, 432 (N.Y. 1991). "Substantial pain" must be "more than slight or trivial pain." *People v. Chiddick*, 866 N.E.2d 1039, 1040 (N.Y. 2007). "Pain need not, however, be severe or intense to be substantial." *Id.*

Contrary to Defendant's argument, the Court finds that Defendant had the requisite intent to injure Shammai. As an initial matter, the Court finds both Shammai's and Mr. Dizon's testimony on this issue to be credible. Mr. Dizon testified to a

"heated conversation" between Shammai and Defendant, before
Defendant grabbed Shammai and caused them both to fall to the
ground. (April 10, 2025 Revocation Hr'g Tr. 8:5-8.) Mr. Dizon
also testified to having to physically separate Defendant and
Shammai, out of fear for their safety. (*Id.* 8:9-9:2.) Shammai
testified that the altercation occurred when Defendant "got upset"
and Defendant "hit" him in the head. (May 15, 2025 Revocation
Hr'g Tr. 80:24-81:13.) Moreover, Defendant's own words and actions
– chasing Shammai around his kitchen, lunging at Shammai, kicking
at him, and telling Shammai that he was going to "fuck him up" –
shows Defendant's intent to injure Shammai. (GX 12.)

The government presented evidence, viewed objectively,
unaccompanied by Shammai's testimony regarding the degree of pain
he experienced, that Defendant inflicted physical injury to
Shammai, although not as defined in New York Penal Law § 10.00.
The record evidence establishes that Defendant struck Shammai in
the head and pushed Shammai onto the ground, causing Shammai to
incur a head injury, pain while chewing for several days, and an
open laceration to his elbow. (May 15, 2025 Revocation Hr'g Tr.
83:7-11; 109:12-110:13.) These injuries are likely to have caused
substantial pain, despite Shammai's testimony minimizing his pain
and minimizing Defendant's conduct.[2] As the New York Court of

---

[2] The Court notes that Shammai's testimony of "minor" pain is contradicted by
his testimony that his pain persisted for several days after the incident at
Defendant's home. (*See* May 15, 2025 Revocation Hr'g Tr. 109:15-110:13.) The

Appeals has held, substantial pain "is more than slight or trivial pain" but it need not "be severe or intense[.]"  *Chiddick*, 866 N.E.2d at 1040.

The Court acknowledges, however, that evidence that a victim cried, felt an unspecified degree of pain and suffered a "red mark" after being hit twice by the defendant, without more, is insufficient to establish substantial pain.  *See Matter of Philip A.*, 400 N.E.2d 358, 359 (N.Y. 1980).  Nor is evidence of a one-centimeter laceration above a victim's lip sufficient to establish substantial pain.  *See People v. Jiminez*, 433 N.E.2d 1270 (N.Y. 1982).  Rather, the threshold for substantial pain has been found to be "more than a mere technical battery," and that "petty slaps, shoves, kicks and the like delivered out of hostility, meanness and similar motives" are not within the statutory definition of New York Penal Law § 10.00.  *People v. Henderson*, 708 N.E.2d 165, 166 (N.Y. 1999); *see also People v. Chandler*, 502 N.Y.S.2d 46, 47 (2d Dep't 1986) (finding no "substantial pain" where victim was struck on the head with a gun but the blow did not cause him to lose consciousness, fall, seek medical treatment, or suffer after effects).  Here, there is no evidence that Shammai sought medical treatment for his injuries from Defendant's blows and physical

---

Court further notes that Shammai's minimization of Defendant's conduct and the degree of pain he experienced may be explained, in part, by evidence of Defendant's mother offering to pay Shammai more money if he did not report the incident to the police.  (*See* GX 31.)

contact.

Government Exhibits 20 and 21, which are pictures taken of Shammai's face shortly after the physical assault by Defendant at his home do not depict any clear injury to Shammai's face or head. (GX 20 & 21.)  *See People v. McDowell*, 270 N.E.2d 716, 717 (N.Y. 1971) (finding that the "incidental reference to a blackened eye without any development of its appearance, seriousness, accompanying swelling, or suggestion of pain was insufficient" to establish substantial pain).  Additionally, the Court's consideration of Shammai's subjective experience weighs against a finding of substantial pain.  At the revocation hearing, Shammai testified under oath that he experienced "minor" pain and "discomfort." (May 15, 2025 Revocation Hr'g Tr. 110:3-10.)  Thus, even if Shammai was minimizing his pain, the Court's findings based on Shammai's subjective experience could not support a finding of "substantial pain."  Furthermore, although courts consider a victim's subjective experience in finding substantial pain under § 10.00, that finding must still be supported by objective evidence.  *See Philip A.*, 400 N.E.2d at 359.  No such objective evidence is present here.  Accordingly, the Court finds that the government has failed to prove Charge Two.[3]

---

[3] The government appears to have proven that Defendant committed the state crime of harassment, in violation of New York Penal Law § 240.25.  However, Charge Two did not charge such a violation and the New York Court of Appeals has made it clear that harassment is not a "lesser-included" offense under New York criminal law.  *See People v. Moyer*, 265 N.E.2d 535, 536 (N.Y. 1970) (noting

**c. Preponderance Finding on Charge Three**

The Court finds that the government has not proven Charge Three by a preponderance.  Defendant was arrested and charged on March 29, 2025 with violating New York Penal Law § 260.10, which requires proof that the defendant acted "in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old[.]"  "Actual harm to the child need not result for liability under the statute to attach," rather, it is "sufficient that the defendant act[ed] in a manner which is likely to result in harm to the child, knowing of the likelihood of such harm coming to the child." *People v. Simmons*, 699 N.E.2d 417, 418 (N.Y. 1998).  "The key term is likely; there is no requirement that the physical, mental or moral welfare of the child be in fact injured." *People v. Castanza*, 37 N.Y.S.3d 668, 669 (Dist. Ct. Suffolk Cnty. 2016).  The statute does not require that the conduct be specifically directed at a child; "rather, a defendant must simply be *aware* that the conduct may likely result in harm to a child, whether directed to a child or not." *People v. Johnson*, 740 N.E.2d 1075, 1076 (N.Y. 2000) (emphasis in original).  There must also be a "nexus" between the defendant's conduct and the likelihood of injury to the child.  *See People v. Coveney*, 21

---

that "[i]t may well be that the violation of harassment was introduced into the new Penal Law to cover conduct less serious than the revised and redefined offense of criminal assault, for instance, to cover such 'petty batteries' as a 'harmless shove or kick' . . . But this does not mean that the one offense (harassment) is included in the other.")

N.Y.S.3d 523, 528-29 (2d Dep't 2015).

There is no evidence in the record that the Minor Victim, or any of Shammai's other minor children, knew that Shammai was shoved, kicked, and hit by Defendant in a physical altercation. The video evidence does show, however, that Defendant was yelling "dirty fucking kids," and "get the fuck out of here now" while walking behind Shammai and his children as they walked in a hurried manner to the exit of Defendant's home. (*See* GX 14.) There is no evidence that Defendant made any physical contact with Shammai or his children while they are exiting the home. There is also no audible or visible crying from the Minor Victim on this video clip, despite testimony from his mother, Sara, that both she and the Minor Victim were crying after leaving Defendant's home. (*See id.*; June 13, 2025 Revocation Hr'g Tr. 421:7-13.) At approximately 9:56:54 EDT on Government Exhibit 14, three seconds after Shammai and his children exit video frame, a door is heard slamming shut. (*Id.*) Almost immediately after that, Defendant can be heard saying "fucking scumbags" outside of the video frame, but inside the house. (GX 14.)

Shammai, and his wife Sara, testified that the Minor Victim was upset by the encounter and fell on the ground outside Defendant's home as they were leaving. (May 15, 2025 Revocation Hr'g Tr. 85:10-86:1; June 13, 2025 Revocation Hr'g Tr. 419:22-420:15.) The Court notes, however, that Shammai's and Sara's

13

testimony regarding the Minor Victim's fall is far from clear.  On the afternoon of the day of the incident, video evidence depicts Shammai at the Nassau County police station, while on the phone with Sara, reporting to the Nassau County police that Defendant "swatted" at the Minor Victim.  (GX 27.)

At the revocation hearings, while testifying under oath, both Shammai and Sara denied seeing what caused their son to fall.  (May 15, 2025 Revocation Hr'g Tr. 85:10-86:1; June 13, 2025 Revocation Hr'g Tr. 420:23-421:20.)  Sara also testified that as Defendant was cursing and yelling at them to leave, she felt Defendant lightly "tap" her on the back as she was standing by the door frame of the house, while the Minor Victim tripped and fell further out by the steps outside the house.  (June 13, 2025 Revocation Hr'g Tr. 419:6-420:10.)  These inconsistencies and apparent lack of candor by Shammai and Sara are noted by the Court, and are weighed against their closer-in-time statements to Nassau County law enforcement.  *See Hyman v. Brown*, 927 F.3d 639, 661-62 (2d Cir. 2019) (noting that a factfinder has "discretion to credit parts of a witness's testimony despite discrediting others"); *United States v. Norman*, 776 F.3d 67, 78 (2d Cir. 2015) (stating that factfinder is "free to believe all, some, or none of a witness's testimony" (internal quotations omitted)).  However, the Court finds that, regardless of Shammai's and Sara's inconsistent testimony, there is no evidence or testimony in the record that Defendant was

14

outside with Shammai and his family as they were leaving and as the Minor Victim fell.  To the contrary, the audio on the video evidence suggests that Defendant remained inside his home after slamming the door closed.  (*See* GX 14.)

On this record, the Court finds that the government has not proven Charge Three by a preponderance of the evidence.  Although Defendant's behavior around Shammai's children was certainly appalling and likely to be upsetting to the child's emotional welfare, it did not meet the criminal requirements of the penal law.  Were the Court to adopt the government's position, any adult loudly arguing with another adult and using profanities in the vicinity of children could be subject to criminal prosecution.

Indeed, the Court's review of the government's cited authority only supports the conclusion that the facts presented in this record are insufficient to find that Defendant violated New York Penal Law § 260.10.  First, the government relies on *People v. Simmons*, 699 N.E.2d 417 (N.Y. 1998), for the assertion that vulgar language alone may constitute a violation of New York Penal Law § 260.10.  In *Simmons*, the New York Court of Appeals found sufficient evidence for a child endangerment charge where a daycare worker made mocking and sexually vulgar remarks to a child in her care over the course of six weeks.  *Id.* at 419.  Notably, the defendant's conduct in *Simmons* was directed solely to the child and took place over a prolonged six-week period during a crucial

stage of the child's intellectual and social development. *See id.* Here, Defendant's profane verbal statements lasted, at most, two minutes as Shammai and his children walked away from him.

The other case cited by the government is similarly distinguishable. In *People v. Bray*, 848 N.Y.S.2d 738 (3d Dep't 2007), the Third Department found sufficient evidence to sustain a child endangerment charge where defendant physically and verbally abused the children's mother and prevented the children from leaving their vicinity. There, in preventing the children from leaving, the defendant directly subjected the children to his physical and verbal abuse of their mother. Here, as depicted on video in Government Exhibit 14, Shammai's children were exposed to Defendant's yelling for at most two minutes and there is no evidence indicating that they were aware of Defendant's physical altercation with Shammai earlier that morning. Accordingly, the Court finds that the government has not proven Charge Three by a preponderance of the evidence.

## II. Charge Four – Menacing of Brianna Peace

### a. Factual Findings

At approximately 5:00 p.m. on January 24, 2025, Brianna Peace was working as an assistant nurse manager in the emergency department at Mount Sinai South Nassau in Oceanside, New York. (April 10, 2025 Revocation Hr'g Tr. 68:1-25.) At or around this time, Ms. Peace heard Defendant screaming profanities at the staff

16

located at the other end of the emergency department. (*Id.* 69:1-7.) Ms. Peace walked over to investigate, and heard Defendant say "Where is that fucking c--t" several times. (*Id.* 69:22-70:4.) Ms. Peace then heard from Defendant that he had been asked to supply a second urine sample after the first sample had spilled in the lab. (*Id.* 70:5-11.) Ms. Peace testified that Defendant then picked up the IV pole that was connected to his arm and began swinging it in her direction from a few feet away. (*Id.* 70:14-22; 71:1-3.) Ms. Peace "felt threatened," and "stepped back," and attempted to de-escalate the situation. (*Id.* 71:6-10.) Defendant subsequently walked over to the bathroom to provide another urine sample. (*Id.*) Defendant's wife, who accompanied him in the emergency room, then began to scream at hospital staff that "nothing was being done" and that "they had been waiting for a long time." (*Id.* 72:8-14.) Ms. Peace approached Defendant's wife and explained that she would be escorted out of the emergency room because of her behavior. (*Id.* 71:1-72:10; 73:7-12.) Defendant then got up and started screaming that he can tell his wife what to do, but nobody else can. (*Id.* 73:13-19.) Ms. Peace explained to Defendant that he may remain at the hospital because he was a patient, but his wife would need to leave. (*Id.*) Defendant then moved towards Ms. Peace and began to yell profanities at her, including repeatedly saying that he was going to "fucking kill" her. (*Id.* 74:7-14; 75:1-4.) During this

interaction, Defendant took a step towards Ms. Peace and was immediately pushed backwards by hospital security. (*See* DX-B.) In the ensuing altercation, hospital security pushed Defendant back an additional time, causing the IV needle to come out of Defendant's arm. (*Id.*)

### b. Preponderance Finding on Charge Four

Defendant was arrested and charged on March 26, 2025 with violating New York Penal Law § 120.14, which provides that a person is "guilty of menacing in the second degree when [he] intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument . . . or firearm." N.Y. Penal Law § 120.14. An object may qualify as a dangerous instrument under the meaning of the statute so long as "under the circumstances in which it is used, attempted to be used or threatened to be used, [it] is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(13).

The Court finds that the Defendant's swinging of his IV pole at Ms. Peace constituted a dangerous instrument under the statute. From the video evidence, the IV pole appears to be made of metal, is at least five feet in length, and is capable of inflicting physical injuries to someone struck by it. (*See* DX-B.) It is well-established that, in determining whether a "dangerous instrument" was displayed within the meaning of the statute, "the

object itself need not be inherently dangerous." *People v. Carter*, 423 N.E.2d 30, 32 (N.Y. 1981). Indeed, the New York Court of Appeals has held that even a common handkerchief may be a "dangerous instrument" within the meaning of § 10.00(13). *See People v. Cwikla*, 386 N.E.2d 1070, 1074 (N.Y. 1977). Other similarly unremarkable objects have been held to constitute a "dangerous instrument." *See People v. Rumaner*, 357 N.Y.S.2d 735, 736 (3d Dep't 1974) (finding leather boots to be a dangerous instrument where they were used to kick a victim in the face); *People v. Bouldin*, 338 N.Y.S.2d 686, 687-88 (3d Dep't 1972) (finding a spatula to be a dangerous instrument where it was used to inflict a cut).

The Court finds credible Ms. Peace's testimony that Defendant swung an IV pole in her direction while yelling repeatedly that he was going to "kill" her, thus intentionally placing Ms. Peace in reasonable fear of her physical injury. Ms. Peace credibly testified that she feared that Defendant was intending, and was going to cause her physical injury when he swung the metal IV pole at her. The Court respectfully disagrees with Defendant's argument that because the incident was not captured on video, and because Ms. Peace knows and works with the hospital security guard, her testimony should not be credited. As Ms. Peace testified at the hearing, certain incidents involving the threats and aggression by Defendant occurred in a patient care area where there are no video

19

cameras, (April 10, 2025 Revocation Hr'g Tr. 75:18-3.), and thus could not have been captured on video.  Additionally, after Defendant swung the IV pole at Ms. Peace, he continued to be agitated and aggressive towards hospital staff, which is clearly depicted on video on Defense Exhibit B.  Accordingly, the Court finds that the government has proven Charge Four by a preponderance of the evidence.

**III. Charge Five – Menacing of Edward Miller**

    **a. Factual Findings**

At approximately 10:30 a.m. on March 22, 2025, Edward Miller was worshipping at a synagogue in Lawrence, New York.  (May 15, 2025 Revocation Tr. 23:22-24:13.)  Mr. Miller credibly testified at Defendant's revocation hearing that, during the religious service, Mr. Miller politely asked Defendant to stop talking, which led to Defendant loudly screaming at and threatening Mr. Miller, and stopping the service.  (*Id.* 24:3-7; 27:24-28:4.)  Defendant then left for approximately ten minutes before he walked back to Mr. Miller, got close to his face, and said "Do you know who I am?" and "Do you know what I could have done to you?"  (*Id.* 24:22-25:8; 28:22-29:1.)  Defendant also made a reference in Hebrew to the "Angel of Death."  (*Id.*)  Defendant then grabbed Mr. Miller's right arm so tightly with his left hand that it caused Mr. Miller pain, which caused Mr. Miller to raise his left hand above his head in anticipation of shielding himself from being hit by

Defendant. (*Id.* 24:25-25:8; 26:11-27:10; 28:22-29:1.) Mr. Miller asked Defendant to let him go, but Defendant refused and told Mr. Miller to lower his hand. (*Id.* 26:11-27:10.) Mr. Miller testified to feeling "absolutely terrified" to be threatened by Defendant's "out of control" behavior during this interaction. (*Id.* 29:5-18.)

### b. Preponderance Finding on Charge Five

On March 26, 2025, Defendant was arrested and charged with violating New York Penal Law § 120.15, which provides that a person is "guilty of menacing in the third degree when, by physical menace, he or she intentionally places or attempts to place another person in fear of . . . imminent serious physical injury or physical injury." N.Y. Penal Law § 120.15.

Here, Defendant not only screamed verbal threats of physical harm, including by asking Mr. Miller "do you know who I am," and "do you know what I can do to you?", Defendant also grabbed Mr. Miller's arm tightly enough to cause pain. (May 15, 2025 Revocation Hr'g Tr. 29:2-4.) Mr. Miller testified to being "absolutely terrified," such that he raised his arm above his head to protect himself from an anticipated battery by the Defendant. (*Id.* 29:5-18.) The Court finds that Mr. Miller's testimony was credible and his fear of injury from Defendant was well-founded. Defendant intentionally placed Mr. Miller in fear of physical injury by screaming threats at Mr. Miller and physically grabbing Mr. Miller's arm with sufficient force to cause pain. On this

21

record, the Court finds that the government has proven Charge Five by a preponderance of the evidence. *See In re Denzel F.*, 843 N.Y.S.2d 60, 62 (1st Dep't 2007) (finding sufficient for New York Penal Law § 120.15 where defendant was "in front of the complainant with his fist cocked in front of the complainant's face").

## IV. Charges Six and Eight – Sexual Assault and Forcible Touching

### a. Factual Findings

The Court finds credible the following hearing testimony of Danelle, the Brauns' live-in nanny.

At approximately 6:15 a.m. on February 15, 2025, Defendant's live-in nanny, Danelle, heard a knock on her bedroom door. (April 11, 2025 Revocation Hr'g Tr. 143:14-22; 144:2-5.)  Thinking that one of the Braun children was knocking, Danelle opened her door and saw Defendant, who was shirtless. (*Id.* at 143:14-22; 145:9-12.)  Defendant told Danelle that he had an argument with his wife and had asked his wife, along with her parents, to leave the house. (*Id.*)  Defendant then proceeded to walk inside Danelle's bedroom and sit on her bed. (*Id.* 143:14-144:25.)  Danelle, feeling uncomfortable, suggested that Defendant call his wife in the morning and asked if she could go check in on the kids. (*Id.*)  Defendant then pulled Danelle down on her bed with her back to his bare chest, his right arm wrapped around her upper body, and his left arm around her neck in a "head lock." (*Id.* 144:19-145:8.)  While holding her in his arms, Defendant began touching Danelle's

22

breast under her shirt and said that he had always wanted to have intercourse with Danelle. (*Id.* 145:13-17; 146:12-14.) Defendant then asked Danelle if she had always wanted to have intercourse with him, and whether she liked what he was doing. (*Id.* 146:1-4.) Danelle answered "no" to both questions and that she did not like what Defendant was doing, which caused Defendant to tighten his grip around her neck. (*Id.* 146:1-8.) Defendant continued to touch Danelle and placed her hand under his clothes and on his genitals. (*Id.* 146:9-22.) Danelle then took her hand off Defendant's genitals and told Defendant that they were both married and that she was menstruating. (*Id.* 146:23-147:5.) Defendant assured Danelle that they were not doing anything wrong as long as they do not have intercourse. (*Id.*)

To extricate herself from Defendant, Danelle told Defendant that she had to use the bathroom, and she took her phone which had an ongoing FaceTime call with her long-distance husband. (*Id.* 148:11-19.) After entering the bathroom, Danelle woke her husband up and began communicating with him through text messages while he stayed on the FaceTime call so that Defendant would not know that she was speaking with someone on the phone. (*Id.*) As Danelle and her husband were trying to figure out what to do, Defendant began asking Danelle to let him into the bathroom, which was locked. (*Id.* 149:8-21.) Danelle continued to try to get help by communicating with her husband, the police, Defendant's wife, and

Defendant's mother. (*See id.* 149, 156-58, 160, 164-65, 166:9-19; GX 9-11.) While locked in the bathroom, Danelle texted Defendant's wife that Defendant "tried to feel [her] up." (GX 10.) Danelle testified to being so frightened that she began to throw up and she told Defendant that she was not feeling well. (*Id.* 150:3-7.) Defendant said he could make her feel better if she opened the door. (*Id.*) As Danelle's husband tried to reach the police, Defendant began pushing on the doorknob and saying that he would leave after he attained orgasm. (*Id.* 159:5-16.)

At some point, Defendant left Danelle's bedroom. (*Id.* 161:3-10.) Defendant returned to Danelle's room shortly after to ask her why the police are at the house. (*Id.*) Danelle, fearing that Defendant would be upset if she told him why the police were called, told Defendant that the police were at the house because she was feeling ill and that they would take her to see a doctor. (*Id.* 161:11-16.) Defendant then told Danelle that "if the police asked, nothing happened." (*Id.* 161:19-22.)

Danelle testified to crying and feeling "exhausted," "terrified," and "shocked." (*Id.* 148:8-19.) Danelle also testified to feeling "scared" and wanting to "be very far away." (*Id.* 161:22-162:1.) Danelle testified that she did not want to be hurt by Defendant and feared that Defendant would kill her. (*Id.* 152:17-19; GX 11 at 5, 9, 10.) Danelle testified to being afraid because she "knows how he can get" and has previously "heard him

24

get angry." (April 11, 2025 Revocation Hr'g Tr. 152:20-23; 160:4-12.) Danelle's fear was founded on a previous incident where she heard Defendant's wife scream "stop" before running out of the house. (*Id.* 153:2-13.) Danelle also heard Defendant on the phone threatening people if they did not pay him money. (*Id.* 157:2-12; GX 11 at 5.) ("He knows people he's dangerous and I don't want him to hurt me.")

**b. Preponderance Finding on Charges Six and Eight**

On February 28, 2025, Defendant was arrested by the Nassau County Police Department, and charged with violations of New York Penal Law § 130.52(1), which provides that a person is guilty of forcible touching when such person intentionally, and for no legitimate purpose "forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person, or for the purpose of gratifying the actor's sexual desire[.]" N.Y. Penal Law § 130.52(1). The government must also show that the sexual act was committed without the victim's consent. *See* N.Y. Penal Law § 130.05(2)(c). As defined by the New York Court of Appeals, "any bodily contact involving the application of some level of pressure to the victim's sexual or intimate parts qualifies as a forcible touch within the meaning of Penal Law § 130.52." *People v. Hatton*, 44 N.E.3d 188, 192 (N.Y. 2015).

Charge Eight also charges that Defendant violated New York

25

Penal Law § 130.65(1), which provides that a person is guilty of sexual abuse in the first degree when he "subjects another person to sexual contact by forcible compulsion[.]"  N.Y. Penal Law § 130.65(1).  Forcible compulsion is defined as compelling another "by either . . . use of physical force; or . . . a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person."  N.Y. Penal Law § 130.00(8).

Defendant's sole contention to these charges is that Danelle's testimony is incredible and should not be credited.  (ECF No. 248, "Def't Mem." at 16.)  The Court disagrees and finds Danelle's testimony credible.  First, Danelle's testimony is corroborated by her near-contemporaneous text messages with her husband.  (*See* GX 11.)  Second, although Defendant urges the Court to apply the principle of *falsus in uno, falsus in omnibus*, Defendant points to no examples where Danelle testified falsely or dishonestly.  Instead, Defendant points to Danelle's statements to the police officer in her bedroom during the morning of the assault where she failed to mention certain details of the assault.  (Def't Mem. at 16-17.)

Contrary to Defendant's argument, the Court finds Danelle's initial reluctance to divulge all details of her assault to be an unpersuasive reason to discredit her testimony.  Danelle testified that, on the date of the assault, she was exhausted, frightened

26

and wanted only to leave Defendant's home and return to her own home. (April 11, 2025 Revocation Hr'g Tr. 148:8-19; 161:23-162:1.) Additionally, as depicted on the officer's body worn camera, Danelle was visibly upset and crying while speaking to the officer.[4] (*See* DX-D.) Moreover, at the time of those statements, Danelle was still located at the scene of the assault, without knowing for certain where Defendant might be and whether he could hear what she said. Based on all the above, the Court finds that Danelle's initial statements to law enforcement do not impeach her credibility.

With respect to Charge Six, the evidence establishes that Defendant forcibly and intentionally touched Danelle's breasts, against her will, for no legitimate purpose but to degrade and abuse her for his own sexual desire, as he expressed. With respect to Charge Eight, the evidence established that Defendant subjected Danelle to sexual contact by forcible compulsion when Defendant held Danelle by the neck in a headlock position, and physically placed Danelle's hand on his bare genitals and touched her breasts. The evidence also establishes that, as Defendant held Danelle to her bed, Danelle feared imminent injury, harm, or death at the

---

[4] As shown in that same body camera footage, the police officer had only asked Danelle where Defendant had touched her – and not whether Defendant directed her to physically touch Defendant's genitals. Danelle's failure to mention that Defendant put her hand on his genitals in addition to her statement that Defendant touched her breasts is, at most, a failure to divulge additional information beyond what was asked of her while she was upset, fearful and in shock at the scene of the encounter. The Court finds that Danelle's testimony was neither dishonest nor inconsistent testimony. (*See* DX-D.)

hands of Defendant. Accordingly, the Court finds the government has proven Charges Six and Eight by a preponderance.

## V.    Charge Seven – Petit Larceny

The Probation Department also charges Defendant with petit larceny in violation of New York Penal Law § 155.25 in connection with Defendant's failure to pay tolls at the Atlantic Beach Bridge between approximately May to July 2024.  Defendant was arrested on August 20, 2024, and charged with violating Section 155.25, which provides that "[a] person is guilty of petit larceny when he steals property."  N.Y. Penal Law § 155.25.

At Defendant's April 10, 2025 revocation hearing, Raymond Webb, an Executive Director of the Nassau County Bridge Authority, testified to becoming aware of multiple instances of toll evasion at the Atlantic Beach Bridge between approximately May to July 2024 by the driver of a white Lamborghini Urus and black Ferrari. (April 10, 2025 Revocation Hr'g Tr. at 41:2-5; 41:22-42:5.)  As depicted in Government Exhibit 37, the white Lamborghini Urus did not have a license plate and instead had a black dealer plate with the name "Perillo."  (*See* GX 37.)    According to Mr. Webb, the evading black Ferrari also traveled without a license plate. (April 10, 2025 Revocation Hr'g Tr. 42:5-11.)  Both vehicles evaded tolls by "following another car using the E-Z Pass system, tailgating them and following through the gates[,]" without paying a toll.  (*Id.*)  In total, Mr. Webb estimates that the driver of

the offending Lamborghini and Ferrari evaded over $300 worth of tolls. (*Id.* 55:4-7.)

As Mr. Webb testified at the hearing, toll plaza personnel record instances of toll evasion on an internal Toll Evader Observation Sheet. (*Id.* 44:3-45:12.) The Toll Evader Observation Sheet records the date, time, lane, toll lane number, plate number if one is available, make and model of the car, and the name of the staff member who observed the evasion. (*Id.*; GX 15.) After the evasion is noted on the Toll Evader Observation Sheet, toll plaza personnel then review video surveillance. (April 10, 2025 Revocation Hr'g Tr. 44:16-22.) Mr. Webb's staff observed toll evasion by the Lamborghini and Ferrari approximately 75 times by the time a complaint by the Nassau County Bridge Authority was made with the Nassau County Police Department. (*Id.* 50:9-17.)

At some point during summer of 2024, Mr. Webb was notified that an employee had observed the evader driver of the Lamborghini and Ferrari vehicles come through the toll lane as an occupant in another vehicle, (*id.* 46:17-47:5), specifically, in a Land Rover or Range Rover with a license plate number KYT2716. (*Id.* 53:7-54:15.) Mr. Webb ran the Rover's license plate information in the New York Motor Vehicle database and ascertained that the vehicle was registered to Defendant's wife. (*Id.* 53:23-54:15; 141:10-11.) Mr. Webb subsequently drove to the address on record for the Rover vehicle and observed the Rover and Lamborghini parked at that

address.  (*Id.* 54:20-55:3.)

A toll plaza staffer, who is referred to as "Ryan," observed and logged several incidents of toll evasion by the driver of the white Lamborghini and black Ferrari on a Toll Evasion Observation Sheet.  (*See* GX 15.)  In a subsequent photo array conducted by Detective Sean Burns, Ryan identified Defendant as the driver of the white Lamborghini and black Ferrari that evaded tolls by marking Defendant's photo with his initials.[5]  (May 15, 2025 Revocation Hr'g Tr. 70:8-71:4; GX 5 at 2, 4.)

Even without Ryan's identification of Defendant as the driver and toll evader, the Court finds ample additional evidence in the record showing that Defendant was the driver of the toll evading vehicles.  First, body camera footage from officers responding to a domestic violence incident at Defendant's residence on August 20, 2024 depicts a white Lamborghini Urus with a "Perillo" black dealer plate and a black Ferrari parked at Defendant's residence. (GX 32 & 33.)  These vehicles match the toll evading vehicles depicted in Government Exhibits 36 and 37, and identified in Mr. Webb's testimony.  (*Compare* GX 32 & 33 *with* GX 36 & 37; April 10, 2025 Revocation Hr'g Tr. 46:4-14.)  Moreover, photos of Defendant's

---

[5]  Detective Sean Burns, the officer who conducted the photo array with the toll worker witness, Ryan, described the photo array as "a series of six photos of individuals that we provide to a victim or a witness of a crime."  (May 15, 2025 Revocation Hr'g Tr. 65:7-18.)  Detective Burns further explained that the individuals depicted in the photo array will "all share similar initial characteristics[.]"  (*Id.* 65:7-18.)  The witness or victim will then identify anyone they recognize in the photo array.  (*Id.*)

residence taken by Defendant's assigned Probation Officer also depict a white Lamborghini Urus with a "Perillo" dealer plate parked outside Defendant's address. (*See* GX 35 at 1-2.)  On this record, the Court finds Charge Seven to be proven by a preponderance of the evidence.

## VI.    Charge Nine – Failure to Pay Fine

Defendant is required, as a condition of supervised release, to make payments towards his $100,000 fine under a court-ordered schedule.  Specifically, starting from the first day of the first month of Defendant's release, Defendant was ordered to pay $2,500 per month or 15% of his gross monthly income after deductions required by law, whichever is greater.  (Judgment at 7.)   It is undisputed that, following Defendant's commencement of supervision on January 19, 2021, Defendant has failed to make payments in accordance with the schedule set forth in his Judgment.  To date, Defendant has paid only $22,800 of his $100,000 fine.   (ECF No. 229, "VOSR Supp." at 3-4.)

Evidence in the record indicates that, between January 2021 to the present, Defendant had access to funds that he used for various purposes instead of paying his court-ordered fine.  First, Defendant employed a butler, Justin Dizon, who testified that Defendant would buy him clothes as compensation for his services. (April 10, 2025 Revocation Hr'g Tr. 6:2-6.)  Second, in and around November 2021, Defendant had access to significant amounts of cash

based on Foxwood Casino records, including a sum of $29,200.  (GX 25 at 11-12.)    Third, Defendant reported to his probation officer that he is employed but had not provided verification, and that his earnings are directly deposited into his bank account.  (ECF No. 214, "VOSR Rep." at 13.)    Defendant further reported that his family "takes care" of him financially so he need not use his employment earnings towards his life expenses.  (*Id.*; VOSR Supp. at 3-4.)    Defendant lives in a multi-million dollar property, as depicted in the video evidence.  (*See, e.g.*, GX 7.)    He drove luxury automobiles including a Ferrari and a Lamborghini during his supervised release.  (*See, e.g.*, GX 32 & 33.)    Despite these resources, Defendant has paid only $22,800 against his $100,000 fine.  (VOSR Supp. at 3-4.)    Accordingly, the Court finds Charge Nine proven by a preponderance of the evidence.

## CONCLUSION

For the foregoing reasons, the Court finds that the government has not proven Charges One, Two, and Three.    The government has proven Charges Four, Five, Six, Seven, Eight, and Nine by a preponderance of the evidence.

All parties shall appear for sentencing at **11:00 a.m.** on **October 9, 2025.**  The Probation Department is respectfully directed to submit an updated Pre-Sentence Investigation Report by September 15, 2025.    Defendant shall submit his sentencing submission by September 22, 2025.    The government shall submit its

sentencing submission by September 29, 2025.

**So ordered.**

Dated:      September 5, 2025
            Brooklyn, New York    **Kiyo A. Matsumoto**
            United States District Judge
            Eastern District of New York